<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARITZA MELENDEZ,<br><br>             Plaintiff,<br><br>       v.<br><br>KRISTI NOEM,<br>Secretary, U.S. Department of Homeland Security<br><br>             Defendant. | No. 19cv4830 (EP) (JBC)<br><br>**OPINION** |

**PADIN, District Judge.**

Plaintiff Maritza Melendez brings claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, for gender and racial discrimination she faced while working as a canine handler for the Transportation Safety Administration ("TSA") at Newark Liberty Airport in Newark, New Jersey, and the ensuing retaliation that followed her filing a complaint with the Equal Employment Office ("EEO"). D.E. 16 ("Amended Complaint" or "Am. Compl.").

Before the Court are cross-motions for summary judgment. Defendant Kristi Noem, Secretary, U.S. Department of Homeland Security ("DHS"),[1] moves for summary judgment on both counts of the Amended Complaint under Fed. R. Civ. P. 56(a). D.Es. 112-13. ("Defendant's Motion" or "Def. Mot."). Plaintiff separately moves for partial summary judgment on Count II, EEO Retaliation under Title VII. D.E. 118 ("Plaintiff's Motion" or "P. Mot."). The Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b). For the reasons

---

[1] Alejandro Mayorkas, former Secretary of the DHS, was the previous Defendant in this action. On January 25, 2025, Kristi Noem took office as Secretary of the DHS. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted the parties accordingly.

explained below, the Court will **GRANT in part** and **DENY in part** Defendant's Motion, and **DENY** Plaintiff's Motion.

## I.    BACKGROUND

### A.    Factual Background[2]

#### 1.    Background on key individuals

Plaintiff, a Hispanic female, held several roles with TSA during her tenure from 2002 to 2021.  Defendant's Counter-Statement ¶¶ 1, 22.  In 2013, she joined the Canine Unit at Newark Liberty International Airport ("Newark Airport") as an Explosive Detection Canine Handler.  *Id.* ¶¶ 1-2.  In this role, Plaintiff was assigned to work with her canine to screen vehicles and passengers' property for explosives across Newark Airport's three terminals (Terminals A, B, and C), although she primarily worked in Terminal C.  Plaintiff's Counter-Statement ¶¶ 3, 9.

Alexander Pareja-Pucci, a Hispanic male, also joined TSA in 2002.  *Id.* ¶¶ 16, 22.  Mr. Pareja-Pucci has held various managerial roles with TSA at Newark Airport, and in 2014, became Lead Terminal Manager of Terminal C, the airport's largest terminal.  *Id.* ¶ 20.  As Lead Terminal

---

[2] The facts are drawn from Defendant's Statement of Material Facts, D.E. 113-1 ("Defendant's Facts"); Plaintiff's Responsive Statement of Material Facts, D.E. 116-1 ("Plaintiff's Counter-Statement"); Plaintiff's Statement of Material Facts in her Motion for Summary Judgment, D.E. 118-1 ("Plaintiff's Facts"); Defendant's Responsive Statement of Material Facts, D.E. 119-1 ("Defendant's Counter-Statement"); and the exhibits referenced in these submissions.  "[A] party asserting a fact is (or cannot be) genuinely disputed must support the assertion by (A) 'citing to particular parts of materials in the record . . .' or (B) 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'"  *Dor v. TD Bank*, No. 21-18955, 2023 WL 9017558, at *9 (D.N.J. Dec. 29, 2023) (quoting Fed. R. Civ. P. 56(c)(1)).  Additionally, where parties opposing summary judgment disagree with the movant's statement of material facts, "they must indicate 'each material fact in dispute and cit[e] to the affidavits and other documents submitted in connection with the motion.'"  *Id.* (quoting L. Civ. R. 56.1(a)).  Facts unsupported by citations to record evidence are not considered, and responses that do not cite to record evidence are deemed admissions.  *See Vorhies v. Randolph Township Bd. of Educ.*, No. 16-587, 2020 WL 278761, at *1 n.2 (D.N.J. Jan. 16, 2020).  A standalone fact without reference to a dispute denotes that the Court has deemed the factual allegation undisputed.

Manager, Mr. Pareja-Pucci was responsible for overseeing Terminal C's operations, including the terminal's screening operations. *Id.* Although canine handlers like Plaintiff do not report directly into the Lead Terminal Manager, they often work together. *Id.* ¶ 21 (citing D.E. 116-2, ("Melendez Decl.") ¶ 11). In addition, canine supervisors coordinate with Lead Terminal Managers and the supervisors direct the handlers accordingly. *Id.*

During her time as a canine handler, Plaintiff had several supervisors, including Christopher Lehn, Michael Jasiecki, Ali Naeem, and Christopher Gerace. Plaintiff's Counter-Statement ¶ 13. Assistant Federal Security Director Matthew Dohn was Plaintiff's second-line supervisor. Defendant's Counter-Statement ¶ 7.

Mr. Pareja-Pucci has never been Plaintiff's supervisor or in her chain of command. Plaintiff's Counter-Statement ¶ 86. Mr. Pareja-Pucci's supervisor was Dominic Imperato, and Assistant Federal Security Director Tony Cubilette[3] and Deputy Assistant Federal Security Director Christopher Murgia were also in Mr. Pareja-Pucci's chain of command. Defendant's Counter-Statement ¶¶ 14, 24, 31. During the relevant time period, Thomas Carter oversaw all TSA operations at the Newark Airport as the Federal Security Director. *Id.* ¶ 15. Mr. Murgia reported to Mr. Carter. D.E. 118-8, Deposition of Thomas Carter ("Carter Dep.") at 44:23-25.

### 2. *August 3, 2017 Incident*

Plaintiff's claims arise from a series of interactions between her and Mr. Pareja-Pucci. The first incident occurred on August 3, 2017, when Mr. Pareja-Pucci approached Plaintiff in Terminal C and inquired why she was nearly 30 minutes late to her station. Defendant's Counter-Statement ¶ 5; *see also* Plaintiff's Counter-Statement ¶¶ 27, 29. The parties dispute whether Mr. Pareja-Pucci

---

[3] Mr. Cubilette was Mr. Imperato's supervisor. *See* D.E. 118-9, Deposition of Dominic Imperato ("Imperato Dep.") at 30:13-14.

3

"yelled" at or "berated" Plaintiff, used an elevated tone, or whether Plaintiff was alone during this interaction or with her white male partner. Defendant's Counter-Statement ¶ 5.

There is no video footage of this incident. D.E. 134 at 1. At her deposition, Plaintiff stated that Mr. Pareja-Pucci "singled [her] out" as the only female, although there was a male handler next to her. D.E. 115-2, Deposition of Maritza Melendez ("Melendez Dep.") at 58:23-59:2. Plaintiff does not recall the length of the interaction, nor does she have any recollection that Mr. Pareja-Pucci said anything to her regarding her gender or race. Plaintiff's Counter-Statement ¶¶ 28, 32; Melendez Dep. 59:16-20. Mr. Pareja-Pucci did not make physical contact with Plaintiff. *Id.* ¶ 31.

Following the interaction, Plaintiff notified her direct and second line supervisors via email. Defendant's Counter-Statement ¶ 7. Her supervisors informed her they were addressing the incident with Mr. Pareja-Pucci and his chain of command. Plaintiff's Counter-Statement ¶ 36. An email from Mr. Dohn on August 3, 2017 to Plaintiff and Mr. Gerace confirms this. *See* D.E. 116-6 ("I have addressed this with Mr. Cubilette."). In a separate affidavit, Mr. Cubilette states that he had a meeting with Mr. Pareja-Pucci to discuss the incident and to "instruct him if he needed to communicate with the Canine team he must contact the supervisor only and not the handlers." D.E. 116-15 at DEF000133.

### 3.    *February 5, 2018 Incident*

There is video footage of the next incident between Plaintiff and Mr. Pareja-Pucci, which occurred on February 5, 2018 in Terminal C of Newark Airport. Plaintiff's Counter-Statement ¶ 38. Mr. Pareja-Pucci approached Plaintiff in the middle of the "bustling" airport terminal. *Id.* ¶ 39. The parties dispute whether Mr. Pareja-Pucci "berated" Plaintiff and whether members of the

traveling public paused to "stare at the spectacle [Mr. Pareja-]Pucci was causing."[4]  Defendant's Counter-Statement ¶ 9.  At her deposition, Plaintiff stated that Mr. Pareja-Pucci approached her in an "irate" manner and questioned her about her and her partner's timing.  Melendez Dep. 65:18-25.  Plaintiff states that Mr. Pareja-Pucci continued to raise his voice because he "didn't like [Plaintiff]'s response" and "like, slamm[ed] his fist in his hand."  *Id.* at 66:22-25.  In an EEO Witness Form, Mr. Pareja-Pucci denied "berating" Plaintiff but stated he may have raised his voice due to the loud volume of the airport at that time.  D.E. 118-15 ("Pareja-Pucci EEO Witness Affidavit") at DEF000080-81.

Mr. Pareja-Pucci briefly walked away.  Defendant's Counter-Statement ¶ 11.  During that time, Plaintiff, facing the other way, heard Mr. Pareja-Pucci yelling behind her, punching his first into his hand.  Melendez Dep. 67:21-23.  Mr. Pareja-Pucci then came back and appears to have made contact with Plaintiff's shoulder to get her attention.[5]  Defendant's Counter-Statement. ¶ 11.  The parties disagree of the nature of the contact.  Plaintiff characterizes the contact as a "grab."  *Id.*  In his EEO Affidavit, Mr. Pareja-Pucci answered "no" when asked if he "walk[ed] away and then return[ed] and *grab[bed]* [Plaintiff's] shoulders."  Pareja-Pucci EEO Witness Affidavit at DEF000081 (emphasis added).  At his deposition, Defendant described the contact as a "tap."  D.E. 115-3, (Deposition of Alexander Pareja-Pucci ("Pareja-Pucci Dep.")) at 48:11-20.[6]

---

[4] After reviewing video submitted by the parties, D.E. 118-12, the Court did not notice members of the public stopping to observe the conversation between Plaintiff and Mr. Pareja-Pucci.

[5] The Court reviewed the video footage of the incident at issue and finds that the contact is not clearly visible as the parties go behind a column around the moment of the contact.  Therefore, the Court relies on the deposition testimony of Plaintiff and Mr. Pareja-Pucci.

[6] The Court acknowledges Mr. Pareja-Pucci's point that he stated "no" to a question in the EEO Affidavit asking if he "*grab[bed]*" Plaintiff's shoulder, which is different from asking if he had made *contact* with Plaintiff's shoulder.  Pareja-Pucci Dep. at 48:17-20 (emphasis added).

Mr. Pareja-Pucci removed his hand "almost immediately after" he made contact with her shoulder.  Melendez Dep. 70:24-71:1; Plaintiff's Counter-Statement ¶ 42.  Mr. Pareja-Pucci stated he did not interact with Plaintiff's male partner because he was alerting her to an upcoming decoy.[7] Defendant's Counter-Statement ¶ 13.  Mr. Pareja-Pucci again made no statement to Plaintiff regarding her race or gender.  Plaintiff's Counter-Statement ¶ 43.

Plaintiff reported the interaction to her supervisors via phone and email shortly thereafter. Defendant's Counter-Statement ¶ 9.  She also spoke to Mr. Murgia regarding the incident, who advised Plaintiff to file an EEO complaint.  *Id.* ¶ 9.  On February 7, 2019, Plaintiff initiated the EEO process by contacting an EEO Counselor, and formally filed an EEO complaint on May 29, 2018.  Plaintiff's Counter-Statement ¶ 42.

### 4.    *February 22, 2018 Incident*

The facts concerning the incident on February 22, 2018 are also disputed.  Plaintiff states that another canine handler, Peter Costa, told her that Mr. Pareja-Pucci was attempting to remove her from Terminal C.  Plaintiff's Counter-Statement ¶ 45; Melendez Dep. at 82:9-22.  Plaintiff believed that Mr. Costa's basis for telling her Mr. Pareja-Pucci was attempting to remove Plaintiff from Terminal C was that Mr. Costa "had overheard it from someone that worked with [Mr. Pareja-]Pucci on the screening side."  *Id.* at 83:8-12.

Mr. Dohn corroborated Plaintiff's claim that Mr. Pareja-Pucci asked about removing Plaintiff as a canine handler on multiple occasions.  *Id.* ¶ 44; *see also* D.E. 118-5, Deposition of Matthew Dohn ("Dohn Dep.") at 27:19-28:23.  However, it is not clear to the Court when Mr. Pareja-Pucci approached Mr. Dohn about removing Plaintiff from Terminal C.  *See generally*

---

[7] "A decoy describes when volunteers, which can be TSA employees or employees from other federal agencies, carry training explosives in an active line to test a dog and canine handler." Plaintiff's Counter-Statement ¶ 54.

Dohn Dep. Mr. Pareja-Pucci denies ever trying to have Plaintiff removed from Terminal C. Defendant's Counter-Statement ¶ 17 (quoting Pareja-Pucci Dep. at 178:12-14.).

### 5.    March 12, 2018 Incident

The facts surrounding the March 12, 2018 incident are disputed as well. Plaintiff states that she and her canine partner Brik were screening in the passenger queue when Mr. Pareja-Pucci positioned himself nearby and in her line of sight, "glaring at her and gesticulating whenever her K-9 alerted to the possible presence of explosives." Defendant's Counter-Statement ¶ 20. According to Plaintiff, the interaction could have lasted the entire length of her rotation, about 20 to 30 minutes. Plaintiff's Counter-Statement ¶ 45 (citing Melendez Dep. 91:21-92:3). Defendant disputes this fact, citing Mr. Pareja-Pucci's denial in his EEO affidavit when asked whether he stood near or glared at Plaintiff. Defendant's Counter-Statement ¶ 20 (citing Pareja-Pucci EEO Witness Affidavit at DEF000087). Plaintiff reported the incident to her immediate supervisors that day in light of the ongoing EEO investigation. *Id.* ¶ 21.[8]

Plaintiff also testified that on March 12, 2018, she learned from her supervisors that Mr. Pareja-Pucci was complaining on the phone "about the only female handler [impliedly Plaintiff] working her job at that check point at the time, that [she] had too many referrals." Melendez Dep. 89:8-21.

### 6.    March 28, 2018 Incident

The next incident occurred on March 28, 2018. Mr. Pareja-Pucci approached Plaintiff "shoulder-to-shoulder" to speak with her about decoys. Plaintiff's Counter-Statement ¶ 53.

---

[8] On May 2, 2018, Plaintiff's counsel had a mediation with Mr. Pareja-Pucci's supervisor, Mr. Imperato, in an effort to "resolve the ongoing retaliation and harassment". Defendant's Counter-Statement ¶ 31. The parties dispute whether Mr. Imperato was shown the video of the March 12, 2018 incident, or just a screenshot. *See id.* During his deposition, Mr. Imperato remembered leaving the meeting to ask questions of Mr. Murgia concerning the incident, but did not recall seeing the video. Imperato Dep. at 31:15-23.

Plaintiff cannot recall which canine handler she was paired with at the time of the interaction, but stated it was a white handler because she was the only non-white male handler on her shift. *See* Melendez Dep. 93:10-22, 94:17-23. Plaintiff does not recall Mr. Pareja-Pucci's tone during the conversation, but felt that his informing her that there was a decoy to have been an effort to intimate her. *Id.* at 95:5-14, 96:6-10. Mr. Pareja-Pucci did not make any physical contact with Plaintiff following this interaction. Plaintiff's Counter-Facts ¶ 62.

### 7. *May 2, 2018 Incident*

On May 2, 2018, Plaintiff and her canine Brik failed a certification airflow test in a public area of Terminal C. Plaintiff's Counter-Statement ¶¶ 55-56. Before the test began, Mr. Pareja-Pucci was in the area of the test. *See* Defendant's Counter-Statement ¶ 29. Plaintiff could not recall Mr. Pareja-Pucci doing anything other than standing in her proximity. Melendez Dep. 113:2-6. Still, this made Plaintiff uncomfortable, so she notified her supervisor Mr. Lehn. *Id.* at 101:16-22. At Plaintiff's request, Mr. Lehn asked Mr. Pareja-Pucci to leave the area. Defendant's Counter-Statement ¶ 29. According to Plaintiff, Mr. Pareja-Pucci refused to leave, got very angry, and insisted on remaining in Plaintiff's vicinity. *Id.*; *see also* Melendez Dep. 101:16-102:6. Plaintiff states Mr. Lehn ordered *her* out of the terminal because Mr. Pareja-Pucci refused to leave. Melendez Dep. at 103:3-104:5.

Mr. Pareja-Pucci partially disputes Plaintiff's recollection, stating that he was not in the immediate vicinity close to her on that date. Defendant's Counter-Statement ¶ 29. Mr. Pareja-Pucci could not recall during his deposition exactly when,[9] but acknowledged there was a time he

---

[9] When asked by Plaintiff's counsel Timothy Parlatore when he was told that Plaintiff felt uncomfortable by his presence, Mr. Pareja-Pucci stated that he did not recall when the conversation occurred. *See generally* Pareja-Pucci Dep. at 129. After back and forth between the parties, Mr. Parlatore asked Mr. Pareja-Pucci how many (and which) languages he spoke and then stated "Okay. I'm going to ask this question again. I'll do it very slowly for you. Was it during an

needed to leave the terminal because he was making Plaintiff nervous.  *See* Pareja-Pucci Dep. at 128:4-139:15.

Although Mr. Pareja-Pucci was not in the area when Plaintiff's test began, Plaintiff was still nervous and fearful based on the events in the minutes leading up to the test.  Melendez Dep. at 102:13-22.  As a result of failing the test, Plaintiff and Brik were required to enter a 30-day training schedule.  Defendant's Counter-Statement ¶ 32.  Being in training (as opposed to in her normal duties) made Plaintiff ineligible for overtime pay, shift or weekend differentials, and removed her eligibility for hazardous duty pay as she was not allowed to handle explosives.  *Id.* ¶ 33.  Given Brik's performance issues throughout the training, the trainer terminated the 30-day training after about two-and-a-half weeks, and sent Brik to an air force base (Lackland Canine Training Center) for further evaluation.  *Id.* ¶ 34; *see also* Melendez Dep. 118:2-119:17, 121:6-126:12.  The canine trainer unilaterally determined that Brik needed to return to Lackland; TSA Newark management and Mr. Carter were not involved in that decision and had no knowledge of the decision until they were told it was happening.[10]  Carter Dep. at 70:9-71:4.  A few weeks later, in June 2018, Plaintiff was reassigned a new dog, Zmay.  *Id.* ¶ 62.

### 8. *Conduct Following May 2, 2018*

On May 14, 2018, Plaintiff received notification of the conclusion of EEO counseling and her right to file a formal complaint, which she did on May 29, 2018.  *Id.* ¶¶ 65, 67; D.E. 114-3 ("EEO Complaint" or "EEO Compl.").  On May 27, 2018, Mr. Pareja-Pucci was promoted from

---

airflow test? Do you understand that question?" *Id.* at 131:15-18.  He then followed it up with "Is this easier for you when I slow down the questions? *Id.* at 132:3-4.

Having reviewed the record extensively, the Court takes notice of the repeated examples of unprofessional conduct by Mr. Parlatore during the depositions of Mr. Pareja-Pucci and to a lesser extent during the depositions of Mr. Imperato and Mr. Carter.

[10] Plaintiff has not claimed that Brik was reassigned to another handler because of her race and gender.  Plaintiff's Counter-Facts ¶ 61.

Lead Terminal Manager to Deputy Assistant Federal Security Director ("DASFD"). Defendant's Counter-Facts ¶ 38.

Over the next several months, Plaintiff reported several incidents to her supervisors where she believed Mr. Pareja-Pucci was trying to intimidate her by approaching her and either directly contacting her or loitering in her presence. She documented several of these incidents in writing to her supervisors. For example, on August 1, 2018, Mr. Pareja-Pucci was in the canine queue area, which Plaintiff testified affected her performance; Plaintiff paused the line to immediately report this to Mr. Lehn, and later, to Messrs. Lehn, Naeem, and Dohn. Plaintiff's Counter-Facts ¶ 43; *see also id.* ¶ 47. Mr. Jasiecki similarly testified that Mr. Pareja-Pucci would frequently stand in the doorway of the shared office area of TSA employees, including canine handlers, canine managers, and supervisors. D.E. 118-3, Deposition of Michael Jasiecki, ("Jasiecki Dep.") at 27:6-28:15. Although Mr. Pareja-Pucci had an ostensible reason to be there,[11] Mr. Jasiecki did not recall ever seeing Mr. Pareja-Pucci in the office before Plaintiff filed her EEO Complaint. *Id.*

Similar incidents occurred throughout 2018 and into 2019. For instance, in January 2019, Mr. Pareja-Pucci was again in the canine unit's office area while Plaintiff was present, and on a separate occasion, emailed Mr. Jasiecki with video of Plaintiff and other canine handlers who were supposedly slowing down the passenger flow. Defendant's Counter-Facts ¶ 55; *see also* D.E. 118-45 (statement from Mr. Jasiecki noting Mr. Pareja-Pucci sent him four video clips, two of Plaintiff

---

[11] Defendant notes that the canine area where Plaintiff would sit is located in an area within the main office where I Band Managers, including Mr. Pareja-Pucci *when he was lead terminal manager*, sat. Defendant's Counter-Facts ¶ 55 (emphasis added). Therefore, Defendant contends, "it is not surprising that Mr. Pareja-Pucci would be standing in or near the doorway area of the canine area when the managers and the canine unit sections were all located in the same main office." *Id.* However, Mr. Pareja-Pucci was promoted to DAFSD in May 2018. *Id.* ¶ 38. Therefore, Defendant's purported reasoning does not explain Mr. Pareja-Pucci's continued presence in the area following his promotion.

10

and two of a different handler, that Mr. Pareja-Pucci believed showed the canine teams slowing passenger flow, but Mr. Jasiecki disagreed with that determination).

On April 13, 2019, Plaintiff reported another instance when Mr. Pareja-Pucci was in the canine office, which she immediately reported to Mr. Jasiecki via email.  D.E. 118-26 at DEF000322.  Mr. Jasiecki forwarded the email to Mr. Murgia, and added, "I do not want to overstep my boundaries but something has to be done. EDCH Melendez['s] anxiety level has gotten to the point that it is now making her sick where she needs to go home. Please advise what actions you would like me to take to rectify the current situation." *Id.*

Mr. Jasiecki proposed several alternative solutions to Mr. Pareja-Pucci's chain of command, including shifting Plaintiff's work schedule, requesting Mr. Pareja-Pucci stay out of the canine office for a few hours during Plaintiff's shift, and building a partition in the office.  *Id.* at 36:18-37:13.  He stated, "I was told that they're not going to do anything about it.  They're not doing anything."  *Id.* at 37:14-15.  In an email to Plaintiff on May 31, 2019, Mr. Dohn informed Plaintiff that "we the Canine leadership team are not to engage with [Mr. Pareja-Pucci] in regards to you and your case by senior leadership," and that Mr. Dohn "secured space for the teams to work in Terminal A," and that the "teams can go there to do admin work."  Defendant's Counter-Statement ¶¶ 79-80 (citing D.E. 118-53, "May 31, 2019 Email").

In July 2019, Plaintiff and her dog Zmay failed to pass an annual multi-day evaluation in Terminal C, but passed when re-tested in Terminal A shortly thereafter.  *See* Defendant's Counter-Statement ¶¶ 79-80 (internal citations omitted).  In 2019, there was also a dispute concerning Plaintiff's performance review.  According to Mr. Dohn, Mr. Cubilette pressured Plaintiff's supervisors to lower her ratings, which they refused to do.  Defendant's Counter-Statement ¶ 97; Dohn Dep. at 48:2-3 ("he tried to get us to change [rating], and we didn't change it.").

Plaintiff references other "petty" conduct by TSA management and Mr. Pareja-Pucci throughout 2019 and into 2020. P. Mot. at 18. For example, on September 11, 2019, Mr. Pareja-Pucci attended a 9/11 ceremony in Terminal A. *See* Defendant's Counter-Statement ¶ 95. Mr. Jasiecki requested Mr. Murgia ask Mr. Pareja-Pucci to leave Terminal A so Plaintiff could comfortably attend the ceremony, but Mr. Murgia refused to do so. Dohn Dep. at 69:2-70:3.

In 2020, Plaintiff eventually stopped working at Newark Airport due to her worsening mental health conditions, and it was about seven months to a year between when she worked at Newark Airport and when she began receiving disability retirement. *See* Defendant's Counter-Statement ¶¶ 81-82 (citations omitted). During this period when Plaintiff was not reporting to Newark Airport, she was on paid leave. *Id.* ¶ 82. In September of 2020, TSA management initiated a fitness for duty "FFD" evaluation request because Plaintiff notified Mr. Jasiecki and Mr. Dohn her mental health was deteriorating due to her work environment. *Id.* ¶ 83. About a month later, in October 2020, TSA's Office of the Chief Medical Officer determined Plaintiff was temporarily not medically qualified to perform her job responsibilities as canine handler. *Id.* ¶ 84.

In February 2021, Plaintiff's application for disability retirement was granted by the Office of Personnel Management ("OPM"). *Id.* ¶ 85 (citing D.E. 115-18). In the form, Mr. Jasiecki (her supervisor at the time) stated that Plaintiff's performance had progressively declined since January 2020 and that while she once was one of the top performers in the unit, she was now ranked at the bottom. *Id.* at PMD000102. In addition, Mr. Jasiecki noted that Plaintiff's excessive absences were brought on by "workplace harassment" and that "no effort has been made to accommodate [Plaintiff]," noting that she was "prohibited to work in certain locations due [sic] in order to avoid hostile work environment." *Id.*

12

### B.    Procedural Background

Plaintiff initially brought this suit on February 6, 2019 against Defendant, Mr. Pareja-Pucci, and three other members of TSA management at Newark Airport.  D.E. 1.  All individual defendants were dropped from the Amended Complaint, leaving only the current Defendant.  Am. Compl.  Fact discovery concluded on August 30, 2023.  D.E. 70.

Defendants and Plaintiff filed their cross-motions for summary judgment on June 27, 2024. Def. Mot.  P. Mot.  Plaintiff opposes Defendant's Motion, D.E. 116 ("Plaintiff's Opposition" or "P. Opp'n"), and Defendant opposes Plaintiff's Motion, D.E. 119 ("Defendant's Opposition" or "Def. Mot.").  Defendant replies to Plaintiff's Opposition, D.E. 117 ("Defendant's Reply" or "Def. Reply") and Plaintiff replies to Defendant's Opposition, D.E. 120 ("Plaintiff's Reply" or "P. Reply").

## II.    LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*  (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.  However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), and statements of undisputed material facts may not "primarily rely on speculation and legal conclusions" or "fail[] to genuinely dispute the facts[,]" *Buxton v.*

*Dougherty*, 821 F. App'x 70, 71 n.2 (3d Cir. 2020).  In employment discrimination cases, "conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment." *Taylor v. Cherry Hill Bd. of Educ.*, 85 Fed. Appx. 836, 839 (3d Cir. 2004).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  Unsworn allegations in memoranda and pleadings or allegations questioning the credibility of witnesses are insufficient to defeat a properly supported summary judgment motion.  *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.    ANALYSIS

Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of her race,

color, religion, sex, or national origin. *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293 (3d Cir. 1999) (citing 42 U.S.C. § 2000e2(a)(1)). It is also unlawful under Title VII for an employer "to discriminate against any of his employees . . . because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Where, as here, a plaintiff does not present direct evidence of discrimination or retaliation, courts apply the three-step, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

For the reasons explained below, the Court will **GRANT in part** and **DENY in part** Defendant's Motion, and will **DENY** Plaintiff's Motion.

### A. Exhaustion

Defendant first argues that the Court should dismiss Plaintiff's claims from the Amended Complaint that do not come within the scope of her initial EEO Complaint or the subsequent investigation as Plaintiff failed to exhaust her administrative remedies with respect to these claims. Def. Mot. at 3-6. Defendant specifically contends that Plaintiff failed to exhaust administrative remedies for her claims that:

> TSA management affirmatively prevented [Plaintiff] from obtaining videos to support her allegations, questioned her canine referrals as excessive, initiated Fitness for Duty ("FFD") evaluations in 2019 and 2020, assigned her to work in locations away from Pareja-Pucci after conclusion of the EEO investigation, or constructively discharged her based on her 2020 disability retirement application, which the Office of Personnel Management granted in 2021.

Def. Mot. at 3-4. The Court agrees with Defendant.

Before bringing a Title VII claim in federal court, a government employee must exhaust her administrative remedies by: (1) consulting with an EEO counselor within 45 days of the alleged discriminatory action, 29 C.F.R. § 1614.105(a)(1); and (2) filing an administrative complaint within 15 days of receiving notice of the right to file from the agency, 29 U.S.C. § 1614.106(b);

*Green v. Postmaster Gen. of the U.S.*, 437 F. App'x 174, 177 (3d Cir. 2011). The plaintiff must also file her action in federal court within 90 days of receiving the agency's final decision or 90 days of receiving the final decision of the EEOC following an optional appeal. *See* 29 C.F.R. § 1614.407. Because "failure to exhaust administrative remedies is an affirmative defense," a defendant bears the burden of proof. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997).

Plaintiff points out that her EEO complaint was filed *before* the above-listed events took place. P. Opp'n at 5. In these situations, the relevant test for a court determining whether a plaintiff was required to exhaust her administrative remedies is "whether the acts alleged in the subsequent district court complaint are fairly within the scope of the prior [EEO] complaint, or the investigation arising therefrom.'" *Petty v. Fed. Bureau of Prisons*, No. 17-3682, 2019 WL 5677729, at *5 (D.N.J. Nov. 1, 2019) (quoting *Fleeger v. Principi*, 221 F. App'x 111, 116-17 (3d Cir. 2007)). This inquiry is a disjunctive test—a plaintiff need not file an additional charge if the allegations of the civil complaint are either fairly within the scope of (1) the pending charge or (2) the investigation arising from the charge. *Simko v. United States Steel Corp*, 992 F.3d 198, 207 n.7 (3d Cir. 2021). The exhaustion inquiry is highly fact specific. *Id.* Under Third Circuit precedent, this Court must "examine carefully" the prior pending complaint and the unexhausted claims on a case-by-case basis before determining that a second complaint need not have been filed. *Robinson v. Dalton*, 107 F.3d 1018, 1024 (3d Cir. 1997).

### 1. The pending EEO charge

The crux of Plaintiff's EEO Complaint is Mr. Pareja-Pucci's treatment of Plaintiff, including the fact he "specifically targeted [Plaintiff] on the basis of her gender and ethnicity." EEO Complaint at DEF000020. The EEO Complaint details numerous occasions where Mr. Pareja-Pucci "singled the [Plaintiff] out for unlawful, unprofessional, and discriminatory treatment," including the August 3, 2017, February 5, 2018, February 7, 2018, March 12, 2018,

March 28, 2018, and May 2, 2018 incidents summarized in *supra* Section I.A. *Id.* In addition, the EEO Complaint references Plaintiff reporting these incidents to her supervisors, as well as to Mr. Pareja-Pucci's chain-of-command. *Id.* at DEF000021. The EEO Complaint includes efforts made to resolve the situation, including one of Plaintiff's supervisors speaking to Mr. Pareja-Pucci about his negative impact on Plaintiff's performance and that a mediation was held with Mr. Pareja-Pucci's chain of command in May 2018. *Id.* at DEF000021-22. The only mention in the EEO Complaint of potentially retaliatory conduct is that Plaintiff learned that Mr. Pareja-Pucci was attempting to have her removed from Terminal C and taken off her shift. *Id.* at DEF000022.

In *Simko*, the petitioner conceded that his subsequent retaliation claim did not fall within the scope of the original charge; there, the Court noted that the narrative in the original complaint contained no reference to conduct that could be construed as retaliatory. 992 F.3d at 208. Unlike the petitioner in *Simko*, Plaintiff does make one reference to retaliation in her EEO complaint— that two weeks after initiating the EEO process, she learned that Mr. Pareja-Pucci was attempting to have her removed from Terminal C and taken off her shift. *Id.* at DEF000022. The EEO Complaint does not provide more detail than that. It also does not connect TSA management to any retaliatory conduct, nor does it allege that any member of TSA management had a retaliatory motive. More broadly, the EEO Complaint does not allege anyone besides Mr. Pareja-Pucci acted with a discriminatory or retaliatory intent.

After reviewing the EEO Complaint, the Court finds that discriminatory and retaliatory conduct from Mr. Pareja-Pucci falls within its scope. As such, Plaintiff did not need to file an additional complaints for subsequent discriminatory and retaliatory conduct related to Mr. Pareja Pucci. However, retaliatory conduct alleged in the Amended Complaint against TSA Management, including affirmatively preventing Plaintiff from obtaining videos, initiating FFD

evaluations, assigning Plaintiff to work in locations away from Mr. Pareja-Pucci, and other conduct leading up to Plaintiff's ultimate discharge, do not fall within the scope of the original EEO Complaint. Therefore, the Court must consider whether those allegations would arise within the scope of a reasonable investigation of the EEO Complaint.

### 2.    *The investigation arising from the charge*

"[W]hen determining whether a claim fairly or reasonably falls within the investigation arising from a charge, courts consider (1) whether the claim arises from the same set of facts that support the original charge and (2) whether the claim advances the same theory of discrimination as the original charge." *Simko*, 992 F.3d at 209; *see also Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-399 (3d Cir. 1976). To do this, the Court first "examine[s] the original charge's contents to determine the reasonable scope of the EEOC investigation that would likely occur." *Id.* (citing *Robinson v. Dalton*, 107 F.3d 1018, 1024 (3d Cir. 1997)). Then, the Court "parse[s] the later claim[s] and determine[s] whether [the] allegations would be covered in that reasonable investigation." *Id.* at 210. Factual overlap between the original charge and the subsequent suit alone, however, does not guarantee that the new allegations are encompassed by the original charge if they do not fall within the "gravamen" of the initial charge." *Id.* at 211. Therefore, the original charge is the "touchstone" of the exhaustion analysis. *Id.* (citing *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996)). Crucially, "the Court must look only at the scope of the EEOC investigation that would reasonably grow out of, or arise from, the initial charge filed with the EEOC, 'irrespective of the actual content of the Commission's investigation.'" *Id.* (quoting *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978)).

Applying the *Simko* test here, the Court finds that Plaintiff has failed to exhaust several of her claims. Plaintiff's EEO Complaint focuses on Mr. Pareja-Pucci's conduct toward Plaintiff.[12] As such, a reasonable investigation would inquire into the interactions underlying those allegations, including: whether Mr. Pareja-Pucci yelled at Plaintiff on multiple occasions, whether any other handlers nearby on those dates could confirm Plaintiff's allegations, whether Mr. Pareja-Pucci attempted to intimate Plaintiff by standing near her or glaring at her from afar, and whether he sought to remove her from Terminal C after she initiated the EEO process. In other words, because the EEO Complaint focuses on Mr. Pareja-Pucci's discriminatory conduct toward Plaintiff and repeatedly references his motivation to discriminate against her based on her race and gender, a reasonable investigation would also focus on verifying Plaintiff's allegations against Mr. Pareja-Pucci and whether he motivated by a discriminatory animus.

Like in *Simko*, where the subsequent conduct referenced in the plaintiff's lawsuit was "only tenuously related to the substance of the original charge," here, Plaintiff's subsequent retaliation claims against TSA management are also beyond the scope of a reasonable investigation into her EEO Complaint. *Simko*, 992 F.3d at 211. There are no references in the EEO Complaint to TSA management seeking to retaliate against Plaintiff. Plaintiff's one reference to Mr. Pareja-Pucci seeking to remove her from Terminal C does not suggest that others were involved in that effort. As Defendant notes, while Plaintiff's EEO Complaint mentions that "'[n]o efforts were made to obtain the video surveillance of the incident' from February 2018, there are no facts claiming TSA upper management affirmatively prevented her from obtaining that video or any other videos, including in 2019-2020." Def. Opp'n at 5 (internal citations omitted). Moreover, as Mr. Murgia

---

[12] The first sentence of Plaintiff's EEO Complaint confirms its limited scope: "This is a complaint regarding the treatment of [Plaintiff] by Lead Transportation Security Manager Pareja-Pucci." EEO Complaint at DEF000020.

explained in his deposition, he did not initially seek video surveillance because Plaintiff's original complaint did not allege physical contact. *See* Murgia Dep. at 20:9-21:15. In light of this context, the Court does not infer a retaliatory intent from TSA management's failure to obtain video surveillance.

Plaintiff did not amend her EEO Complaint or file a new EEO complaint for several events that occurred following her filing, "including that she was approved for FMLA leave in 2019 and 2020; that she had to undergo FFD requests in 2019 and 2020; that she used her sick leave in 2020; and that she applied for, and received, disability retirement in 2021 purportedly due to retaliation." *Id.* at 5. The Third Circuit in *Simko* squarely rejected the notion that an allegedly retaliatory firing two years later would be reasonably expected to grow out of the facts surrounding plaintiff's original charge of discrimination, and thus the Court finds that the same applies here. *Simko*, 992 F.3d at 212.[13]

Therefore, the Court will **DISMISS** the following claims for failure to exhaust administrative remedies: (1) TSA management affirmatively preventing Plaintiff from obtaining videos to support her allegations; (2) TSA initiating FFD evaluations in 2019 and 2020; (3) TSA assigning her to work in locations away from Mr. Pareja-Pucci after conclusion of the EEO investigation; and (4) a claim that TSA constructively discharged her based on her 2020 disability retirement application because these claims were fairly within the scope of the original charge. The Court will analyze claims from which administrative remedies have been exhausted:  the

---

[13] The Third Circuit explicitly declined adopting a broad rule that all post-charge retaliation claims necessarily fall within the scope of the previously-filed complaint. *Simko*, 992 F.3d at 212 (first citing *Waiters v. Parsons*, 729 F.2d 233, 237 n.10 (3d Cir. 1984), then citing *Robinson*, 107 F.3d at 1024 (3d Cir. 1997)).

claims referenced in Plaintiff's EEO Complaint, as well as any further retaliatory action from Mr. Pareja-Pucci.

### B.    Discrimination Claim

Defendant argues that Plaintiff's discrimination claim fails as a matter of law.  Def. Mot. at 7-18.  Under the *McDonnell Douglas* framework, Plaintiff must first state a *prima facie* claim of discrimination.  *Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 305 (D.N.J. 2016) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)).

If a plaintiff states a *prima facie* case, the burden of production shifts to the defendant employer, which must articulate a legitimate basis for the adverse employment action.  *Burton*, 707 F.3d at 426.  "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (internal quotations omitted).  Indeed, the defendant does not need to prove that the articulated reason actually motivated its conduct.  *Id.*  Once the defendant offers a non-discriminatory reason, the burden of production shifts back to the plaintiff.  *Edmond*, 171 F. Supp. 3d at 305.

After reviewing the parties' submissions, the Court concludes Plaintiff has failed to show any action was taken under circumstances giving rise to an inference of discrimination.  Because Plaintiff cannot establish a *prima facie* discrimination claim, the Court will **GRANT** Defendant's Motion as to Plaintiff's discrimination claim.

### 1.    Step one:  the prima facie case

A *prima facie* case of discrimination encompasses four elements: (1) the plaintiff belonged to a protected class; (2) she was qualified for the position in question; (3) she was subject to an adverse employment action; and (4) the adverse action was taken under circumstances giving rise to an inference of discrimination.  *Id.*

21

The first two elements of the *prima facie case* are not in dispute. The record makes clear that Plaintiff, a Hispanic female, was a member of two protected classes. Defendant's Counter-Statement ¶ 22. With respect to her qualifications, Plaintiff was a canine handler for several years and consistently earned high performance reviews. *Id.* ¶ 4. In its motion, Defendant focuses on the third and fourth elements, arguing that Plaintiff cannot show an adverse employment action or that any actions give rise to an inference of discrimination. Def. Mot. at 7-18.

a.    *Inference of discrimination*

Defendant contends that Plaintiff has failed to proffer any direct or indirect evidence of discrimination. Def. Mot. at 12-15; Def. Reply at 5-6. It is not in dispute that Plaintiff offers no evidence of direct discrimination. *See* Pl. Counter-Statement ¶ 43 ("Plaintiff's response: Admits [Mr. Pareja-]Pucci did not make direct statements about her race or gender to her, and none are alleged in the Amended Complaint for that reason.").

Even in the absence of direct evidence, "[t]he inference of discrimination may be presented in the form of evidence of disparate treatment, 'whereby a plaintiff shows that [he or she] was treated less favorably than similarly situated employees' of a different race." *Penn v. ExxonMobil Rsch. & Eng'g Co.*, No. 17-3140, 2019 WL 4745253, at *5 (D.N.J. Sept. 30, 2019) (quoting *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008)). An inference of discrimination can be established in several ways, including comparator evidence, evidence of similar race or gender discrimination of other employees, or direct evidence of discrimination from statements or actions by supervisors suggesting racial animus. *Id.* (internal citations omitted). Evidence of disparate treatment must show that a comparator was "similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).

To determine who is a similarly situated employee, courts consider myriad factors, including the employees' "job responsibilities, supervisors and decision-makers, and the nature of

misconduct engaged in." *Id.* The plaintiff has the burden of demonstrating that similarly situated persons were treated differently. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). Similarly situated does not mean identically situated, but rather that two employees engaged in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). "If a comparator employee is different even 'with respect to at least one relevant factor,' they are not sufficient to ground a claim." *Gibbs v. Brennan*, No. 18-14410, 2021 WL 3661277, at *23 (D.N.J. Aug. 18, 2021) (quoting *id.*). Finally, in determining whether similarly situated employees were treated more favorably, the Court's "focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) (quoting *Simpson*, 142 F.3d at 648).

As a preliminary point, Plaintiff asserts that whether a proposed comparator is sufficiently similarly situated is a question for the jury rather than the Court. Opp'n at 17 (citations omitted). However, the court must "nevertheless evaluate whether there is sufficient evidence that a reasonable jury could conclude that similarity exists." *Gibbs*, No. 18-14410, 2021 WL 3661277, at *23 (citing *Andujar v. Gen. Nutrition Corp.*, 2018 WL 1087494 at *5-6 (D.N.J. Feb. 28, 2018)).

Plaintiff's primary contention is that "[n]o male or white handler was subjected to the same treatment as [Plaintiff]." P. Opp'n at 16. To support this argument, Plaintiff notes that Mr. Pareja-Pucci singled out Plaintiff on multiple occasions despite Plaintiff not being the only one who could have been criticized by Mr. Pareja-Pucci. For example, during the initial August 3, 2017 incident, Plaintiff states that Mr. Pareja-Pucci approached her in Terminal C and inquired why she was late to her station, and that Mr. Pareja-Pucci did not ask the same of her white male partner who was

with her at the time. *See* Defendants' Counter-Statement ¶ 5; Melendez Dep. at 58:23-59:2. Meanwhile, Defendant disputes Plaintiff's recollection; relying on Mr. Pareja-Pucci's deposition testimony, they state that Plaintiff was alone on this incident. Defendants' Counter-Statement ¶ 5.[14] Here, both parties cite self-serving deposition testimony to support their recollection of the August 3, 2017 interaction between Plaintiff and Mr. Pareja-Pucci. Plaintiff does not identify the specific white male handler who she states was with her on this date nor does she provide sufficient corroborating information.[15] Therefore, she has failed to meet her burden of identifying a similarly situated employee on this instance. *See Simpson*, 142 F.3d at 645.

To establish an inference of discrimination based on Plaintiff's gender, Plaintiff cites deposition testimony of canine supervisors Mr. Dohn and Mr. Jasiecki that highlight instances where Mr. Pareja-Pucci had issues with other female employees. For example, Mr. Dohn testified Mr. Pareja-Pucci had issues with a female canine handler's performance, who, like Plaintiff, Mr. Pareja-Pucci criticized for slowing down the security line. Dohn Dep. at 65:7-24. However, this female canine handler is not similarly situated to Plaintiff in several respects. Most notably, unlike Plaintiff—who was an experienced handler and who received consistently positive performance

---

[14] Both parties cite self-serving deposition testimony to support their recollection of the August 3, 2017 interaction between Plaintiff and Mr. Pareja-Pucci. Plaintiff does not identify the specific white male handler with her on this date nor provide corroborating deposition testimony. Even if Plaintiff's recollection were accurate that Mr. Pareja-Pucci chose to confront her and not her white male partner standing next to her, the Court would find that is insufficient to give rise to an implication this initial incident was because of Plaintiff's race or gender. General allegations that employees outside the plaintiff's protected class received better treatment cannot give rise to an inference of discrimination. *See Penn*, 2019 WL 4745253, at *5.

[15] The Court also concludes that the white male canine handler paired with Plaintiff on March 12, 2018 was not similarly situated to Plaintiff because they were not performing the same job at that time. *See* Defendant's Counter-Statement ¶ 21 (where Defendant notes, in response to Plaintiff's statement that Mr. Pareja-Pucci only approached Plaintiff, that Mr. Pareja-Pucci did not take action with the male canine handler working with Plaintiff because Plaintiff was in the queue screening with her dog, whereas the handler was observing).

reviews, Defendants' Counter-Statement ¶ 4—this handler was inexperienced and failed several competency tests. *Id.* at 65:21-66:15.

Mr. Dohn also testified that a hostile work environment complaint *may* have been brought by a female "TSO"[16] against Mr. Pareja-Pucci. Dohn Dep. 56:23-58:5. Not only did Mr. Dohn not recall with certainty whether the complaint was brought by a female, but he stated he was not given any information about the situation beyond there being a hostile work environment claim filed against Mr. Pareja-Pucci. *Id.* at 57:12-21. Even if there was more information in the record, the Court finds this individual not to be similarly situated to Plaintiff: Plaintiff is a canine handler, not a TSO.

Similarly, in his deposition, Mr. Jasiecki testified that he had heard of multiple complaints by "mostly" female employees against Mr. Pareja-Pucci. Jasiecki Dep. at 19:15-20:3. Mr. Jasiecki provides no detail as to these other complaints against Mr. Pareja-Pucci beyond noting that "female screeners" had made harassment allegations for "job-related stuff." *Id.* Based on this undeveloped deposition testimony, a reasonable juror could not find that any of these complaints were filed by individuals similarly situated to Plaintiff. As Defendant points out, Plaintiff did not depose any of these screeners, or provide information in her statements of material facts to show how these individuals were similarly situated to Plaintiff. Def. Reply at 5.

In another effort to show Mr. Pareja-Pucci's discriminatory animus toward women, Plaintiff cites Mr. Dohn's testimony that two white male canine handlers attempted to "push [Mr. Pareja-Pucci's] buttons," yet he did not react toward them the same way he did Plaintiff. Dohn Dep. 59:10-23. Mr. Dohn testified that he put "an end" to these two handlers needling Mr. Pareja-Pucci because Mr. Dohn did not want "another situation" like what happened with Plaintiff to

---

[16] Presumably "Transportation Security Officer."

happen again. *Id.* at 59:20-23. The Court finds these handlers are not similarly situated to Plaintiff because these handlers made comments to Mr. Pareja-Pucci while in the canine queue, whereas Plaintiff was not in the queue, the stated impetus for Mr. Pareja-Pucci's conduct when he first supposedly "berated" Plaintiff for being late for her position. Defendant's Counter-Statement ¶ 5. Furthermore, in the same way "a decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently," the fact Mr. Pareja-Pucci did not respond to conduct from white male employees the same way he did to Plaintiff does not imply Plaintiff was discriminated against because of a protected characteristic. *Simpson*, 142 F.3d at 646.[17]

Finally, Defendant avers that Plaintiff's subjective belief that she was the victim of discrimination is insufficient to support an inference of actual discrimination. Def. Mot. at 14-15. Plaintiff concedes a subjective belief is insufficient to support an inference of actual discrimination, but argues the facts demonstrate that Plaintiff was not alone in believing that Plaintiff was being targeted first by [Mr. Pareja-]Pucci and subsequently by [his] chain of command, including upper management." P. Opp'n at 20. Crucially, absent from Plaintiff's argument is reference to others' belief that Plaintiff was being targeted *because of* a protected characteristic. A *prima facie* case must support the inference that the plaintiff was "discriminated against *because* of [her] race, color, or national origin—it is not *prima facie* discrimination to simply be a member of a protected class who is subjected to a negative employment decision." *Rene v. Lidestri Foods, Inc.*, No. 09-3908, 2010 WL 4807050, at *6 (D.N.J. Nov. 17, 2010)

---

[17] Moreover, even if these two male handlers were similarly situated to Plaintiff, the Court would independently find the August 3, 2017 incident would not give rise to an adverse employment action. *See e.g., Ugorji v. N.J. Envtl. Infrastructure Trust*, 529 F.App'x. 145, 151, n. 4 (3d Cir. 2013) (noting that complaints of yelling did not give rise to an adverse employment action).

(emphasis in original).  While it is clear Mr. Pareja-Pucci had an issue with Plaintiff—it is less clear that any conduct directed toward Plaintiff was due to a protected characteristic as opposed to a reasoning concerning her job performance.[18]

Having concluded that Plaintiff fails to show an inference of discrimination, the Court will **GRANT** Defendant's Motion for Summary Judgment as to Plaintiff's discrimination claim.[19]

### C.    Hostile Work Environment

Defendant also moves for summary judgment on Plaintiff's hostile work environment claim, contending that Plaintiff cannot show that she suffered unlawful intentional discrimination for protected reasons, that Mr. Pareja-Pucci's and TSA's conduct was not severe or pervasive, and TSA took prompt and remedial action in response to her complaints.  Def. Mot. 18-25.  Plaintiff disagrees, arguing that she does establishes all the elements of a *prima facie* case.  *See* P. Opp'n at 26-33.  The Court agrees with Defendant, and therefore, will **GRANT** Defendant's Motion as to Plaintiff's hostile work environment claim.

"An unpleasant work environment is not a good thing, but it is not necessarily actionable, either."  *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016).  Title VII is violated only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and

---

[18] Defendant also argues that Plaintiff has not offered any evidence of race-based discrimination, noting that there is nothing in the record that shows Mr. Pareja had issues with the other three Hispanic or Latino canine handlers similarly situated to Plaintiff during the period at issue.  Def. Mot. at 13 (citing D.E. 114-1).  The Court agrees that the lack of facts in the record that show other members of Plaintiff's race were treated poorly undermines the inference that any conduct directed toward her was motivated by her being Hispanic.  *See Simpson,* 142 F.3d at 646.

[19] Having found Plaintiff fails to show that any conduct occurred under circumstances giving rise to an inference of discrimination, the Court does not consider whether any conduct gives rise to an adverse employment action within the context of a Title VII discrimination claim.  Similarly, because the Court concludes that Plaintiff does not establish a *prima facie* case of discrimination, the Court does not proceed to analyzing steps two or three of the *McDonnell Douglas* framework.

insult . . . that is sufficiently severe or pervasive to . . . create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

To prevail on her hostile work environment claim, Plaintiff must show at step one of the *McDonnell Douglas* framework that: (1) she suffered intentional discrimination *because of* her race and gender; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected Plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race and gender in that position; and (5) the existence of *respondeat superior* liability. *Id.* at 154-55 (citing *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)) (emphasis added). In determining whether an environment is sufficiently hostile or abusive, courts should consider all circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citing *Huston*, 568 F.3d at 104).

Because Plaintiff cannot establish a *prima facie* hostile work environment claim, the Court will **GRANT** Defendant's Motion as to Plaintiff's hostile work environment claim as well.

### 1. Step one: the prima facie case

Defendant argues Plaintiff fails to establish the first, second, and fifth elements of her *prima facie* hostile work environment claim—*i.e.*, that Plaintiff suffered intentional discrimination *because of* her race and gender; the discrimination was pervasive and regular; and the existence of *respondeat superior* liability. Def. Mot. 18-25.

28

### a.    *Unlawful discrimination for protected reasons*

Defendant, in large part relying on the arguments made regarding Plaintiff's discrimination claim, contends that Plaintiff again cannot show she suffered unlawful intentional discrimination for protected reasons.  Def. Mot at 19-20 (citing *id.* at 7-18).  Plaintiff, in opposition, similarly notes this section is repetitive of the discrimination claim arguments.  *See* P. Opp'n at 27.  When a Plaintiff fails to establish a *prima facie* case of unlawful discrimination, they also cannot make out a hostile work environment claim.  *See Iovanella v. Genentech Inc.,* No. 09-1024, 2010 WL 11527386, at *10 (D.N.J. Dec. 31, 2010), *aff'd*, 452 F. App'x 85 (3d Cir. 2011).  Because the Court found *supra* that Plaintiff failed to show any conduct directed toward her was *because of* a protected characteristic, and therefore her discrimination claim failed, Plaintiff cannot establish a *prima facie* hostile work environment claim either.[20]   Therefore, the Court will **DISMISS** Plaintiff's hostile work environment claim.

### D.    Retaliation

Both parties seek summary judgment on Plaintiff's retaliation claim.  As explained below, because there are material facts in dispute, the Court will **DENY** both party's motions and allow the claim to proceed to trial.

Under Title VII, it is unlawful for an employer "to discriminate against any of his employees . . . because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The antiretaliation provision of Title VII protects "an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

---

[20] Because the Court finds that Plaintiff fails to establish a *prima facie* case of her hostile work environment claim, the Court does not proceed to analyzing steps two or three of the *McDonnell Douglas* framework.

53, 67 (2006). Title VII "does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* at 68.

At the first step of the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of retaliation. If a plaintiff puts forth a *prima facie* case, "the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). An employer can satisfy its burden of production at the second step by providing evidence that "advance[es] a legitimate, non-retaliatory reason for its conduct." *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

Finally, at the third step, a plaintiff must "convince the factfinder both that the employer's proffered non-retaliatory explanation was false [that is, a pretext], and that retaliatory animus was the 'real reason for the adverse employment action.'" *Carvalho-Grevious*, 851 F.3d at 258 (quoting *Moore*, 461 F.3d at 342).

In "[a]pplying *McDonnell Douglas* to Title VII retaliation claims, . . . '[a]lthough the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times.'" *Id.* at 257.

           *1.*     *Step one: the prima facie case*

To make out a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore*, 461 F.3d at 340-41 (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

While Defendant concedes that Plaintiff satisfies the first element (protected activity), *see* Def. Mot. at 26, Defendant contends Plaintiff fails to establish elements two and three of a *prima facie* case: that Plaintiff suffered a materially adverse employment action or that there is a causal connection between her participation in the protected activity and the adverse employment action. *Id.* at 26.

### a.    Materially adverse employment action

The standard required to show an adverse employment action in the retaliation context differs from the standard used when analyzing claims of discrimination.[21] *Davis v. City of Newark*, 285 F. App'x 899, 904 (3d Cir. 2008); *Moore,* 461 F.3d at 342. To establish she suffered an adverse employment action in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. This is an objective inquiry. *Griffiths v. Nielsen*, No. 15-2586, 2018 WL 1469051, at *13 (D.N.J. Mar. 23, 2018) (citing *Tourtellotte v. Eli Lilly & Co.*, 636 Fed. Appx. 831, 852 (3d Cir. 2016)).

"[P]etty slights, minor annoyances, and simple lack of good manners" generally will not suffice. *Burlington*, 548 U.S. at 68. However, "[c]ontext matters" such that "an act that would be immaterial in some situations is material in others." *Id.* at 69. For example, in *Burlington*, after considering "all the circumstances," the Court held that the reassignment of a worker to a position

---

[21] The Supreme Court's recent decision in *Muldrow v. City of St. Louis, Missouri*—which changed the meaning of an "adverse employment action" for a Title VII *discrimination* claim—did not alter the standard in the retaliation context. 601 U.S. 357 (2024) (explaining that a heightened standard is appropriate in the context of retaliation (but not the discrimination context) because Title VII's anti-retaliation provision is intended to prohibit employers from taking actions so severe as to deter employees from speaking out against discrimination); *accord Hamilton v. Norristown State Hosp.*, No. 23-4068, 2024 WL 3623521, at *4 (E.D. Pa. Aug. 1, 2024).

with the same job description but with less desirable duties constituted a materially adverse action. *Id.* at 71 (internal quotations omitted).

Plaintiff cites various purported adverse employment actions,[22] including Mr. Pareja-Pucci's "personal retaliatory conduct of intentionally blocking [Plaintiff's] path, interfering with her workspace, glaring at and intimidating her, and at one point coming into physical contact with her for a second time." *Id.* at 25. Plaintiff states that Mr. Pareja-Pucci would stand in areas while she worked despite the fact he had no oversight over canine handlers, and his conduct negatively impacted Plaintiff "to the extent that she and her partner [Brik] failed an airflow test." *Id.* Further, Plaintiff notes that Mr. Pareja-Pucci questioned her referrals on multiple occasions after she initiated the EEO process. *Id.* at 24-25. Plaintiff contends her "exile" to Terminal A was also an adverse employment action. *Id.* at 25.

Most of these actions do not give rise to the level of an adverse employment action in the retaliation context. The interactions between Mr. Pareja-Pucci and Plaintiff on August 3, 2018 and February 5, 2018, including when he touched her shoulder, occurred *before* Plaintiff commenced the EEO process. Therefore, they cannot be retaliatory. The multiple instances where Plaintiff testified that Mr. Pareja-Pucci glared at her from afar, blocked her path, stood in the shared office area, and approached her concerning decoys—all in an effort to intimidate her—do not give rise to an adverse employment action either. *See Ackie v. Phila. Gas Works*, No. 19-4275, 2021 WL 2375876, at *16 (E.D. Pa. June 10, 2021) (noting a supervisor's alleged "stalking" was not an adverse employment action because it was "entirely reasonable" for a supervisor to oversee areas

---

[22] As explained above, the Court only considers Plaintiff's allegations that fall within her original EEO Complaint as well as the reasonable investigation of that complaint. *See supra*, III.A.

under his supervision).[23]   The fact Plaintiff was "subjected to harassment, intense scrutiny and overly-critical supervision as a result of having filed grievances" also does not give rise to an adverse employment action.  *Buffa v. New Jersey State Dep't of Judiciary*, 56 F. App'x 571, 576 (3d Cir. 2003).  In sum, the Court finds Mr. Pareja-Pucci's conduct, including glaring at Plaintiff, standing near her, loitering in her workspace, and blocking her path, all falls into the "petty slights" and "lack of good manners" category that the Supreme Court in *Burlington* stated would not suffice to give rise to an adverse employment action.  548 U.S. at 68.

The decision to return Brik to Lackland Canine Training Center after Plaintiff and Brik failed an evaluation and subsequently did not improve in training also does not give rise to an adverse employment action.  Plaintiff became ineligible for overtime pay not due to retaliation, but because she and Brik failed the airflow test.  *See Spangler v. City of Phila.*, No. 10-3434, 2012 WL 1835599, at *9 (E.D. Pa. May 21, 2012), *aff'd*, 523 F. App'x 142 (3d Cir. 2013) (holding no adverse employment action where a loss in overtime resulted after a plaintiff admitted having no right to overtime).  Further, as Defendant notes, Plaintiff was assigned a new canine about two to three weeks later, limiting the scope of Plaintiff's loss in hazardous and overtime pay.  Def. Mot. at 9.[24]

---

[23] Plaintiff admits that part of Mr. Pareja-Pucci's responsibility in his role as Lead Terminal manager was to oversee operations in Terminal C at Newark Airport, including the screening operations, checkpoint, and baggage.  *See* Plaintiff's Counter-Statement ¶ 20.  Facts unsupported by citations to record evidence are not considered, and responses that do not cite to record evidence are deemed admissions.  *See Vorhies v. Randolph Township Bd. of Educ.*, No. 16-587, 2020 WL 278761, at *1 n.2 (D.N.J. Jan. 16, 2020).  Given Mr. Pareja-Pucci needed to oversee Terminal C's screening operations, the Court finds it entirely reasonable for Mr. Pareja-Pucci to be monitoring areas of Terminal C for which he was responsible, including where Plaintiff worked.

[24] Even if the Court concluded that the decision to return Brik was an adverse employment action, Plaintiff fails to establish a causal connection between that decision and any retaliatory animus. As Plaintiff testified, the canine trainer prematurely terminated Plaintiff's and Brik's training after two-and-a-half weeks because the trainer "gave up."  Melendez Dep. at 118:4-11.  Mr. Carter similarly testified that "the canine training instructor at the time unilaterally with the support of

Plaintiff also argues Mr. Pareja-Pucci's efforts to remove Plaintiff from Terminal C constitutes an adverse employment action. P. Mot. at 25. Removing Plaintiff from her position, or having her transferred to a less desirable location, can undoubtedly be retaliatory conduct. *See Moore*, 461 F.3d at 347 (concluding that transferring an individual is a material adverse action). Furthermore, the record clearly demonstrates that Plaintiff worked almost exclusively in Terminal C—Newark Airport's largest and busiest terminal—prior to her conflict with Mr. Pareja-Pucci. *See* Plaintiff's Counter-Statement ¶ 9. Plus, in Terminal A, Plaintiff conducted administrative tasks, *id.* ¶ 80, which are different from her typical responsibilities as a canine handler in Terminal C.[25] *See id.* at ¶ 9 (noting Plaintiff's spent the majority of her screening hours working in Terminal C working with her canine to screen individual's property, building, and vehicles for potential explosive detection at various locations). The Court therefore concludes that a reasonable juror could find that removing Plaintiff from Terminal C constitutes a materially adverse action because it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

However, it is unclear what role Mr. Pareja-Pucci played in Plaintiff's eventual move to Terminal A in 2019 and whether he actually sought to retaliate against Plaintiff by removing her from Terminal C in February 2018. Plaintiff testified that she learned that Mr. Pareja-Pucci sought to remove her from Terminal C in February 2018 from another canine handler, Mr. Costa, who

---

his canine training center determined that the dog was not salvageable," and that "we not included in that decision." Carter Dep. at 70:9-17. Because Plaintiff has not shown any facts tying this decision to a retaliatory animus, Plaintiff cannot establish a *prima facie* claim as to the decision to deactivate Brik.

[25] While the Court acknowledges Defendant's argument that Plaintiff's job entailed administrative tasks, a reassignment of a worker to a position with the same job description, but with less desirable duties, is considered a materially adverse action. *Burlington*, 548 U.S. at 70.

overheard it from someone else.  Melendez Dep. at 83:8-12.  Mr. Dohn, her second-level manager, corroborated that Mr. Pareja-Pucci asked him about removing Plaintiff as a canine handler on multiple occasions as well.  Dohn Dep. at 27:19-28:23.  On the other hand, Mr. Pareja-Pucci denies trying to remove Plaintiff from Terminal C.  Defendant's Counter-Statement ¶ 17 (quoting Pareja-Pucci Dep. at 178:12-14.)).  Because each party cites to deposition testimony supporting its position, it is for the jury to decide what role, if any, Mr. Pareja-Pucci played in Plaintiff's eventual move to Terminal A in 2019.  Consequently, the Court finds there is a material fact in dispute regarding this adverse employment action.

b.    *Causal connection*

To establish a causal connection between her participation in the protected activity and the adverse employment action, a plaintiff "must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse employment action.'"  *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)) (emphasis in original).  A court may consider a "broad array of evidence" to find a causal link.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).

Courts have tended to focus on two factors: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of "a pattern of antagonism in the intervening period."  *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)).  "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."  *Kachmar*, 109 F.3d at 178.  At bottom, this element "'identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus.'"  *Moore*, 461 F.3d 342 (quoting *Jensen*, 435 F.3d at 449).  Notably, a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of

the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015); *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

Plaintiff states that Mr. Pareja-Pucci first sought to move her from Terminal C in February 2018, about two weeks after she initiated the EEO process. Plaintiff's Counter-Statement ¶ 45. Plaintiff was eventually moved to Terminal A in May 2019. Defendant's Counter-Statement ¶¶ 79-80. The Court first considers whether there is a causal connection between Plaintiff's participation in a protected activity and: (1) Mr. Pareja-Pucci's purported statement that he was trying to remove her from Terminal C in 2018 and (2) her eventual reassignment to Terminal A in May 2019.

### i.    The February 22, 2018 statement

"Unusually suggestive" temporal proximity between the protected activity and adverse action may be "sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (internal citations omitted). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," *id.* at 233, courts have routinely held that a gap of even a few weeks cannot sufficiently give rise to an inference of causation. *See, e.g.*, *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding three weeks to be insufficient). In fact, a temporal proximity of more than ten days requires "supplementary evidence of retaliatory motive." *Blakney*, 559 F. App'x at 186 (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir. 2000).

The Court measures temporal proximity from the date on which the litigant first files a *complaint*. *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 703 (3d Cir. 1989)) (emphasis added). Although Plaintiff initiated the EEO process by contacting an EEO Counselor on February 7, 2018, she did not formally file her EEO

Complaint until May 29, 2018. Plaintiff's Counter-Statement ¶ 42. Because any alleged adverse action occurring before Plaintiff filed her EEO Complaint (May 29, 2018) cannot establish a causal connection, Plaintiff cannot rely on Mr. Pareja-Pucci's purported comment from February 2018.

Even if temporal proximity were to be measured from the date which a litigant first *initiates* the EEO process, the Court would still conclude that Plaintiff fails to establish temporal proximity on this basis. As explained above, Plaintiff testified that she learned from a colleague, Mr. Costa, on February 22, 2018 that Mr. Pareja-Pucci was attempting to remove her from Terminal C—just over two weeks after she initiated the EEO process on February 7, 2018. Plaintiff's Counter-Statement ¶ 45. Plaintiff did not, however, testify as to when the colleague himself learned this information, *see* Melendez Dep. at 82:9-22, nor did she depose Mr. Costa to learn more about his statement. If Mr. Costa passed this information along to Plaintiff when he learned the information himself, there was a fifteen day period between when Plaintiff initiated the EEO process and Mr. Pareja-Pucci supposedly made this statement. The Court therefore concludes that the gap of fifteen days, by itself, is not unusually suggestive.

When "'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Robinson v. SEPTA*, No. 22-4572, 2024 WL 1936242, at *6 (E.D. Pa. May 1, 2024) (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997)). "Such evidence can include a pattern of ongoing antagonism, inconsistencies in the employer's justifications, or any other evidence gleaned from the record as a whole that is sufficient to support an inference of retaliatory animus." *Britt v. Banks*, No. 19-270, 2019 WL 5078731, at *4 (D.N.J. Oct. 10, 2019) (cleaned up). Plaintiff offers no facts in between the period she initiated the EEO process and when she learned that Mr. Pareja-Pucci stated he was trying to remove her from Terminal C. Because Plaintiff does not provide any other evidence of retaliatory

animus, she fails to establish a causal connection between her protected activity and Mr. Pareja-Pucci's supposed remark on February 22, 2018.

ii.        *Plaintiff's move to Terminal A in May 2019*

The Court also considers whether there is a causal connection between Plaintiff's eventual move to Terminal A in May 2019 and the filing of her EEO Complaint in May 2018. Because a period of a few weeks could not establish an unusual temporal proximity, neither can a period of a year. However, there is conduct between May 2018 and May 2019 that could establish a pattern of ongoing antagonism from Mr. Pareja-Pucci toward Plaintiff that would support the inference that her EEO Complaint was the likely reason for her reassignment under the "timing plus other evidence" test. *Blakney*, 559 F. App'x at 186. Specifically, Plaintiff points to evidence that Mr. Pareja-Pucci blocked her path, interfered with her workspace, on several occasions asked Mr. Dohn whether Plaintiff could be moved from Terminal C,[26] and glared at and intimidated Plaintiff by loitering in the shared TSA office. P. Mot. at 25. The Court finds that when considering these actions, a reasonable jury could find that there was a retaliatory animus for Plaintiff's reassignment to Terminal A.

The Court therefore concludes that Plaintiff identifies a material dispute as to whether her protected activity was the likely reason for her reassignment to Terminal A. Because of this dispute, as well as the issue of fact as to the materially adverse employment action, the Court will allow Plaintiff's retaliation claim to proceed to trial.

---

[26] Mr. Dohn did not testify exactly when Mr. Pareja-Pucci approached him about removing Plaintiff from Terminal C, but the Court reasonably deduces it was during the period between when she filed her EEO Complaint and when she was actually reassigned. Dohn Dep. at 27:19-28:23.

2.    *Step two:  Defendant proffers non-retaliatory reasons for its conduct*

The Court will proceed to steps two and three of the *McDonell Douglass* framework as Defendant is still entitled to summary judgment if Plaintiff cannot "convince the factfinder both that the employer's proffered non-retaliatory explanation was false [that is, a pretext], and that retaliatory animus was the 'real reason for the adverse employment action.'" *Carvalho-Grevious*, 851 F.3d at 258 (quoting *Moore*, 461 F.3d at 342).

At step two, the employer must articulate a legitimate reason for the adverse employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255-56 (1981)) (emphasis in original.). The defendant's burden is "one of production, not of persuasion," *Carvalho-Grevious*, 851 F.3d at 262, and is "relatively light" to meet, *Fuentes*, 32 F.3d at 763.

Defendant contends that Plaintiff's reassignment to Terminal A was not retaliatory because canine handlers are not assigned to specific locations. Def. Opp'n at 23-24 (citing Carter Dep. at 83:16-20). Mr. Carter testified that keeping handlers in one location day after day "is not desirable," so handlers are moved between terminals to keep the canines engaged and excited. Plaintiff's Counter-Statement ¶ 18 (citing Carter Dep 83:16-20). Plus, Defendant notes that Plaintiff did not move to Terminal A in May 2019 alone—there were multiple teams and individuals moving as well. *Id.* (quoting May 31, 2019 Email ("I have also secured space for the teams to work in Terminal A so once CES is completed the teams can go there to do admin work. However, there is no connectivity so everyone will have to use their hotspot.") (emphasis added in original). Mr. Carter also testified that TSA found additional space in Terminal A for the canine unit to utilize for rest and other purposes. *Id.* (citing Carter Dep. 82:3-15). Because Defendant

has proffered multiple legitimate explanations as to why Plaintiff was moved to Terminal A in May 2019, it meets the light burden of production required at step two.

        3.     *Step three: There is a dispute of material fact regarding the true motivation for Mr. Pareja-Pucci's conduct*

Because Defendant has met its burden at step two, Plaintiff must show those reasons are pretextual in order to survive summary judgment. Plaintiff can do so by demonstrating "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Defendant's proffered reasons such that "a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non[retaliatory] reasons." *Ross v. Gilhuly*, 755 F.3d 185, 194 n.12 (3d Cir. 2014) (internal quotations omitted).

Plaintiff argues that Defendant's explanation for Plaintiff's reassignment to Terminal A "ignores the far simpler solution" of moving either Plaintiff or Mr. Pareja-Pucci to a later shift in Terminal C. P. Reply at 14. But as Defendant notes, "the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason" for the action was retaliation. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006). The Court is not persuaded by Plaintiff's argument that Defendant's decision was not the simplest, or her preferred choice, as Defendant's decision to move Plaintiff does not need to be Plaintiff's (or her manager's) preferred resolution.

Plaintiff also critiques Defendant's "reli[ance] upon the testimony of noncanine personnel for [the] assertion that "[c]anine handlers were not assigned to a specific location" and the fact that he "ignores the contrary testimony of Plaintiff, [Mr.] Dohn[,] and [Mr.] Jasiecki." P. Opp'n at 25. But Plaintiff does not provide the Court with such contrary testimony from these parties in making this argument. *See id.* The closest the Court found (after making a significant effort to review the record) was Plaintiff's clarification that she spent the majority of her screening hours working in

Terminal C. Plaintiff's Counter-Statement ¶ 9. Because the evidence in the record does not directly contradict the testimony cited by Defendant, Plaintiff has failed to raise a material dispute as to pretext on this point.

Plaintiff also cites to testimony from her supervisor, Mr. Jasiecki, which states his belief that Plaintiff was removed from Terminal C for Mr. Pareja-Pucci's benefit. P. Mot. at 17; *see also* Jasicki Dep. at 49:16-19 ("[I]n my opinion, it was almost like a punishment to Maritza -- look, you're a thorn in our side, so we're going to remove you and move you over to Terminal A so we don't have to hear from you."). The Court agrees with Defendant that Plaintiff's argument fails because "'an inference [of pretext] based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat [entry of] summary judgment.'" Def. Opp'n at 24 (quoting *Steele v. Pelmor Labs., Inc.,* 725 F. App'x 176, 179 (3d Cir. 2018) (internal quotation omitted).

Plaintiff does, however, raise one legitimate contradiction with respect to Defendant's proffered reasons. At one point, Defendant states that TSA secured space in Terminal A so that the canine team could do administrative work in that location. Def. Opp'n at 15. But later, Defendant states "TSA separated Plaintiff and Mr. Pareja-Pucci to the extent possible because Plaintiff was reporting anxiety and fear when Mr. Pareja-Pucci was around, and thus assigning Plaintiff to duties away from Mr. Pareja-Pucci would keep the two employees separate while allowing them to perform their jobs." *Id.* at 23. Although this argument primarily concerns retaliatory conduct of *TSA*, rather than Mr. Pareja-Pucci, the Court finds that the inconsistency calls into question the true motivation for Plaintiff's reassignment, and Mr. Pareja-Pucci's role in that decision.

Therefore, there is a dispute as to whether Mr. Pareja-Pucci would have sought to remove Plaintiff from Terminal A had Plaintiff not initiated the EEO process. *See Carvalho-Grevious*, 851 F.3d at 262. The Court concludes that Plaintiff has raised "'a factual issue regarding the employer's true motivation'" and therefore, her retaliation claim survives summary judgment. *Id.* (quoting *Jalil v. Avdel Corp.*, 873 F.2d 701, 709 (3d Cir. 1989)).

Because of the material facts in dispute concerning Plaintiff's retaliation claim, the Court will **DENY** both party's motions and allow the claim to proceed to trial.

### E. Damages

Plaintiff also moves for partial summary judgment on damages. P. Mot. at 30-32. Plaintiff asks the Court to grant a base figure of $872,754.00 in pecuniary damages, the amount Defendant's expert calculated as Plaintiff's estimate of loss in her rebuttal report to Plaintiff's expert's report. *Id.* at 32. Plaintiff contends that any additional amount can be determined at trial. *Id.*

Defendant raises myriad arguments concerning Plaintiff's request, but it is only necessary to address the first. The Court agrees with Defendant that because Plaintiff "is not entitled to summary judgment on liability, it necessarily follows that she is not entitled to summary judgment on damages." Def. Opp'n at 27. Any determination on damages can be determined at trial. Therefore, the Court will **DENY** Plaintiff's request for $872,754.00 in damages.

## IV. CONCLUSION

For the foregoing reasons the Court will **GRANT in part** and **DENY in part** Defendant's motion for summary judgment and **DENY** Plaintiff's motion. An appropriate Order accompanies this Opinion.

Dated: March 25, 2025

Evelyn Padin, U.S.D.J.